200 So.2d 14 (1967)
LOUISIANA POWER & LIGHT COMPANY
v.
John P. RISTROPH.
No. 7038.
Court of Appeal of Louisiana, First Circuit.
May 29, 1967.
Rehearing Denied June 30, 1967.
*15 Andrew P. Carter, of Monroe & Lemann, New Orleans, Charles O. Dupont, Plaquemine, for appellant.
R. Gordon Kean, Jr., and Robert A. Hawthorne, Jr., of Sanders, Miller, Downing & Kean, Baton Rouge, William O. Templet, of Middleton & Templet, Plaquemine, for appellee.
Before LOTTINGER, REID, and SARTAIN, JJ.
REID, Judge.
Louisiana Power and Light Company, hereinafter called "Power Company," filed an expropriation suit against John P. Ristroph, hereinafter called "Ristroph," on February 11, 1966 seeking a 170 foot right of way for the construction and maintenance of a 500 K.V. (500,000 watts) transmission line over and across defendant's property.
On the same day they filed a similar suit against John C. B. Jumonville, hereinafter called "Jumonville" seeking the same right of way. The suits were consolidated for the purpose of trial in the District Court with separate judgments to be rendered, read and signed in each case, which was done. This case, together with the appeal in the Jumonville case No. 7039 on the Docket of this Court, 200 So.2d 25, were consolidated for argument and decision in this Court, separate judgments to be rendered in each case.
Defendants filed exceptions of prematurity, no cause or right of action and vagueness, and an answer putting all allegations of the petition at issue. Exceptions were referred to the merits by the Trial Judge and after a trial on the merits judgment was rendered overruling the exceptions and in favor of the plaintiff granting the right of way and fixing the quantum of damages as follows:
The award to Ristroph was in the total amount of $67,001.30 and for Jumonville, the total amount of $15,030.96. He assessed the fees of the defendants' appraisers at $375.00 each, in each case plus the sum of $50.00 each for testifying in Court in each case.
Plaintiff appealed herein from these judgments and defendants, who answered the appeal, seeking an increase in the award and reurging their exceptions.
Plaintiff in its Brief sets out the following specification of errors, to-wit:
"A. The District Court erred in concluding that the highest and best use of the subject property were as industrial sites, and in fixing the quantum thereon.
B. Even assuming arguendo that the Ristroph and Jumonville properties are industrial, the District Court erred in not computing the right of way value at 50% of the fee value.
C. The District Court erred in awarding any severance damage to any part of these tracts.
D. The District Court erred in granting the Ristroph-Jumonville motion for new *16 trial and amending the judgment to reserve to defendants a right to recover additional compensation and damage for trees that may be cut or damaged in the servitude area."
Defendants Ristroph and Jumonville in their Brief made the following specification of errors to-wit:
"A: The District Court erred in concluding that plaintiff negotiated in good faith with the defendants and that the action was not premature.
B. The District Court erred in granting plaintiff the right of ingress and egress over the remainder of the properties of Messrs. Ristroph and Jumonville.
C. The District Court erred in awarding to Mr. Ristroph only the sum of Sixty-seven Thousand One and 30/100 ($67,001.30) Dollars rather than the sum of One Hundred Fourteen Thousand Five Hundred Fifty-five and no/100 ($114,555.00) Dollars, and in awarding to Mr. Jumonville only the sum of Fifteen Thousand Thirty and 96/100 ($15,030.96) Dollars rather than the sum of Thirty-two Thousand Two Hundred Twelve and no/100 ($32,212.00) Dollars for the servitude and right of way and other rights awarded to plaintiff in these cases and for severance damages.
D. The District Court erred in fixing the expert witness fees of Mr. Kermit Williams and Mr. W. D. McCants at less than Six Hundred and no/100 ($600.00) Dollars each for preparatory and actual trial work in connection with each of these cases."
We will first take up the question of whether plaintiff negotiated in good faith with the defendants and that the action was premature.
Plaintiff's witness Mr. T. C. Brown testified that he had about five meetings with Mr. Ristroph at which time Jumonville was also present. These meetings took place in August, September, December 1965 and January 1966. As a result of these meetings the Power Company did move their right of way over near the back of the two properties herein involved, but not as far as the defendants desired. They refused to negotiate the question of severance damages because their appraisers stated there was no severance damages.
There is no question but what under LSA-R.S. 19:2 does require in this type of expropriation suits that a bona fide good faith negotiation be made by the expropriating corporation with the land owner as a prerequisite to suit. See Central Louisiana Electric Company v. Covington and St. Tammany Land and Improvement Company, 1st Cir. 1961, 131 So.2d 369. Art. 2627 of Louisiana Civil Code.
However, there is no requirement that these negotiations in good faith be pursued to a conclusion. There is no forced arbitration contemplated under these laws.
Defendants contended that the right of way should be moved to the rear line of their properties so that it would not bisect any of the land. The Power Company went out of its way to relocate the line further toward the rear but the evidence shows that it would have cost over One Hundred Thousand ($100,000.00) Dollars to move the line where the defendants wanted it. In addition they would have to get new rights of way from other people in order to connect up the line. Also, the testimony of witnesses clearly showed that relocating this line would result in angles which would change the surge impedance of the line, and when this is changed it makes it more susceptible to outages. This is one of the reasons why the Power Company seeks to avoid angles in its transmission lines because of this change in surge impedance. This Court passed on this same line of defense in Gulf States Utilities Co. v. Heck, 191 So.2d 761 (Writs refused Dec. 12, 1966, 249 La. 1021, 192 So.2d 370). In this case this Court held, quoting from Louisiana and A. Railway Co. v. Louisiana Railway *17 and Navigation Company, 125 La. 756, 51 So. 712, as follows:
"`The necessity for the exercise for the right of eminent domain must be understood in a reasonable sense, with due regard to the needs of the plaintiff corporation and all the elements of judicious selection. The objection that other property should be taken furnishes no test for the necessity for expropriation in ordinary cases.'
* * * * * *
"`It is elementary that in all expropriation cases the prohibition against arbitrary, unreasonable, capricious and unnecessary taking is ever present. We conclude the provisions of the statute involved herein address themselves primarily to the question of necessity of taking and reasonableness of the exercise of the discretion vested in the expropriating body. We believe the provision places a somewhat more onerous duty on the present plaintiff but that nevertheless it must be construed with reason. The interpretation urged by defendants, namely, that landowners must be protected against any danger or inconvenience at all costs and in any event, is, in our judgment, unreasonable and would lead but to absurd and illogical conclusions. * * *'"
The exceptions of no cause of action and no right of action is founded on the alleged failure of the petition to follow the requirements of LSA-R.S. 19:2.1. We have read these petitions and we feel that the allegations are sufficient. The above conclusion concerning the failure to negotiate in good faith, which is the basis of these exceptions, has been set at rest.
For these reasons we feel that the Trial Judge was correct in overruling the exceptions.
The right of way herein sought by the Power Company is for one of the larger electric power lines, (in fact the largest heretofore built in Louisiana) which line was designed to carry 500,000 volts (500 K.V.) in a northwest to southeast direction through Iberville Parish to the Willow Glen generating station on the east bank of Mississippi River.
In addition they propose in the near future to add two two hundred thirty thousand volts (230 K.V.) electric power to be transmitted over this line.
The servitude requested is for 170 feet in width with the right to clear danger timber in an area 15 feet outside of each boundary of the right of way. The line was designed to have a minimum clearance under all extreme conditions of 35 feet. The powers from which the line will be suspended are of steel construction and will be at a distance of some 800-1150 feet from each other.
The original 500 K.V. line will not service the properties of the two defendants as it is a transmission line, not designed for use locally.
The properties of the defendants are located in Sections 4-5-6 and 7, T 9 S R 13 E, Southeastern Land District of Louisiana. The testimony shows that Jumonville's property is in between two properties of Ristroph. Ristroph's eastern property, or the property east of Jumonville contains approximately 510 acres, and the western portion of his property contains approximately 200 acres. The proposed right of way would divide the Ristroph property of 510 acres almost in half. The right of way would enter the property 2400 feet from the River and go almost to the center of the property. It divides the place of 510 acres into two parcels, 224 acres behind the right of way and 265 acres in front of the right of way. It would divide Jumonville's property into two parcels, one of 273 acres and one of 24 acres.
The record shows that both tracts of land within the right of way of the Ristroph property is 24.10 acres. The total acreage with the right of way of the Jumonville property is 7.64 acres. The Trial Judge in *18 his written reasons held that the highest and best use of the land is for industrial purposes due to its location, and fixed the fee value of the land at $1150.00 per acre. He further held that 90% of the land would be rendered useless to the owner, and awarded Ristroph 90% of the fee value of 24.10 acres at $1150.00 per acre which would amount to the sum of $24,943.50. He further held that 200 feet in width on each side of the right of way, the full length across defendant's property, would be damaged to the extent of 25%, and awarded 25% of the value of the 200 foot strip (50 acres) at $1150.00 per acre, or the sum of $14,375.00. He further held that there were no consequential or severance damages suffered by defendants to any of their property that lay north and west of the right of way other than the damages to the 200 foot strip. He held that the property south and east of the right of way would suffer severance or consequential damages which would cover 225.60 acres of both tracts of the Ristroph tracts of land. He deducted the 25 acres contained in the 200 foot strip lying south and east of the right of way and awarded for the 260 acres remaining severance damage to the extent of 12%, or the sum of $27,682.80. This makes a total award to Ristroph of $57,001.30.
In regard to the Jumonville property the Trial Judge used the same fee value of $1150.00 per acre and held that 90% of the land would be rendered useless. He awarded 90% of the value of 7.64 acres in the right of way which amounted to $7,907.40, as the value of the right of way. He likewise held that the strip of land, 200 feet wide on either side of the right of way and continuous thereto for the entire length of same would be damaged to the extent of 25% of the value. Each strip contains 9 acres for a total of 18 acres for both, and applying the 25% of the value would amount to the sum of $5,175.00. He held that portion of the Jumonville property which lies north of the right of way, other than the 200 foot strip, immediately adjacent thereto would suffer no consequential or severance damages. He found that there were 23.12 acres of land which lies south of the right of way and held that it would suffer severance damages. Deducting the 9 acres contained in the 200 foot strip left 14.12 acres remaining, which he found was damaged to the extent of 12% and awarded the sum of $1948.56. This would make a total award to Jumonville amount to the sum of $15,030.96. Both sides filed motions for new trial and the Court overruled the motion for a new trial for plaintiff but granted a new trial to the defendants. On the new trial he held that the defendants were entitled to collection from the plaintiff for any actual damages when suffered to timber or other property that would be caused by the installation and construction by plaintiff of the power line. Accordingly they amended the judgments to contain this reservation.
The first and main question to be determined in these two cases is the highest and best use of the property. Plaintiff in its Brief concedes that if the properties are found to be industrial then the appraisal of the defendants' witness, Mr. Kermit Williams adopted by the District Court would substantially be a correct valuation of the fee value of these two properties.
Plaintiff used two appraisers, Mr. Max J. Derbes Jr. and Mr. Charles E. Driggers. Mr. Derbes testified that the highest and best use of the land was for agricultural purposes. It was at the time of the appraisal being used for pasturage. He appraised the property at $850.00 per acre and the value of the land within the servitude at 50%, or $425.00 per acre. He testified that the land was really worth only $500.00 per acre, but after checking certain sales down the river he made a second appraisal and in an effort to be fair raised his value to $850.00 per acre.
It was admitted and stipulated that Mr. Driggers' testimony would be substantially in accord with Mr. Derbes, namely, that the land was suitable only for agricultural purposes. However, he found that the property *19 had a value of $750.00 per acre and would use an 80% formula instead of 50% and found no severance damage. Both of plaintiff's appraisers found no severance damage.
Mr. Derbes admitted that he did not go upon the property but that he flew over it twice. He and all the other appraisers used a market data approach. Subsequent to the trial of the Dekle case during the preceding weeks he decided to get a larger piece of acreage to compare to the Ristroph and Jumonville tracts, some twenty-five miles downstream from the Ristroph and Jumonville tracts as the river meanders. In this connection he uses a sale dated June 16, 1965 COB 182, folio 173, Succession of Frank Noel Et Al to the Placid Oil Co. of 1176.47 acres for $1,000,000.00 on the basis of $850.00 per acre. He felt that this property was far superior to the facts at issue here. In addition he used a sale from Riversides Farms, Inc. to First Mississippi River Corporation dated April 20, 1965, COB 184, folio 356 of 1000 acres for $1,000,000.00 or $1000.00 per acre. Another sale was from Theophile Himel to D. C. Forte dated January 27, 1965, COB 182, folio 976, of 132.46 acres with State Highway going to Sunshine Bridge along its upstream side sold at $1000.00 per acre. The next sale he used was of a piece of property without river frontage but with rail frontage, the railroad tracks bordering the property. This was a sale by Riverside Farms Inc. to Gulf Oil Corporation dated January 4, 1966 COB 129, folio 39 of 521.227 acres for $229,705.00 which is on the basis of $575.00 an acre. This property had no river frontage but was right on a 40 arpent line and had rail frontage, with about 70% high land and about 30% wooded land. Taking these properties into consideration only for the purpose of trying to figure the upper limit of value of the subject properties, he put a value of $850.00 an acre on the Ristroph and Jumonville sites in fee and allowed 50% of the fee value for the value of the land within the servitude.
Mr. Derbes in addition testified that property used for industrial purposes must have water connections, rail connections, roads, electricity and gas. This property did front on the river but he stated that it was on the making side bank of the river and the water was shallow, the deeper portion of the river being on the opposite bank. He further stated that the nearest railroad was some three and a half miles and that the gas and electricity was three and a half or four miles from the property.
The defendants used two expert appraisers, Mr. Kermit A. Williams and Mr. W. D. McCants, both competent appraisers from the City of Baton Rouge, who have testified before in many of this type cases. Mr. Kermit Williams testified that he went up on the property and that the highest and best use for the property was for industrial use. He considered the size and shape of the property, the availability of facilities that would be needed to make it advantageous to the user and the general over-all condition of the availability of the property.
He testified that he checked into the availability of rail services, and found that the rail service was approximately three and a half miles away, and would have to cross some six or seven tracts of land to be brought to subject property. He stated that his investigation disclosed that it would cost $50,000.00 a mile plus $20,000.00 for the cost of crossing the highway when it would initially come off the main line to build a railway to subject property. All the property owners had signified they would give a free right of way. With regard to the question of roads, he found that the river road was between the subject property and the Mississippi River levee. It provided similar access to the subject property as had been for the large industrial tracts which had previously sold in industrial uses. In regard to the availability of electricity he stated that it was available but it was a few miles away, the industries would welcome the opportunity to supply a large quantity of industrial electricity and *20 would bring the line in. The same would hold true of the natural gas line which was adjacent to the highway and railroad to the west of the subject property.
With regard to the river frontage he testified that the three properties fronted some 5350 feet on the bank of the Mississippi River. He stated that the depth of the river varied from 10 to 20 feet depending on the exact location near the bank, and of course, it would deepen as it went from the bank, but that it left a little to be desired as far as deep water utility. He further testified that the barge traffic on the Mississippi River in this particular area according to data from the greater Baton Rouge Port Commission was some two to one over river traffic. By river traffic he meant ocean going vessels. He found that this water was definitely suitable for barge traffic.
Mr. Williams used the market data approach and listed certain sales. These sales with one exception involved large tracts with adequate river frontage and had rail facilities. The four sales which Mr. Williams considered to be particularly comparable were the following:
"1. Jennings to Dow. This was a sale in Iberville Parish on July 6, 1960, of 981.13 acres for $1,000.00 an acre. A reference to Defendants' Exhibit 39 will show that it is immediately above the Town of Plaquemine and very close to the subject properties. It had no river frontage but adjoined another tract owned by Dow which did have river frontage. (Dekle Tr. p. 183).
2. Noel to Placid Oil Company. This was the sale of a tract in Ascension Parish on the west side of the River on June 6, 1965. This tract involved contained 1,171 acres and sold for a little over $850.00 per acre. (Tr. pp. 188 and 189). This tract is located downriver from the subject properties and extends beyond the eighty (80) arpent line. (Dekle Tr. p. 271). This sale also included an agricultural lease for $3.00 an acre back to the seller of the tract with a sixty (60) day cancellation clause provided the buyer pays for all crop damage. This is considerable testimony in the record tending to show that this crop lease was a valuable right and increased the net price paid the landowner. (Dekle Tr. pp. 147-148, 150; Tr. p. 219)
3. Laws to Copolymer. This is a sale of a 270.27 acre tract in West Baton Rouge Parish on February 28, 1966 for $1,400.00 an acre. This tract is immediately north of the Dow plant and north of the Plaquemine area. (Dekle Tr. p. 189)
4. Planche to Gulf States. This transaction involved a sale of 400 acres immediately across the River from the subject properties on July 22, 1957, for $1,500.00 per acre. (Dekle Tr. p. 183)
Mr. Williams' estimate of the before and after value of the Ristroph property he gave as follows:

 "JOHN RISTROPH PROPERTY
 BEFORE AND AFTER VALUE ESTIMATE
Total value of land before the taking
 710AC @ $1,150.00 per AC ..................................... $816,500.00
Less cost to bring in rail transportation ......................... 130,000.00
 ___________
 (2/3 cost of 3.5 miles @ $50,000/mile plus $20,000 cost of
 highway crossing)
Present value of land ............................................ $686,500.00
 (Ind. value per AC=$967.00)
Less value of part taken
 24.10 AC @ $967.00 per AC ................................... 23,305.00
 ___________
Value of remaining land as part of whole tract ................... $663,195.00

*21
Less value of remaining land after the taking
 Land within 100' of R/W both sides $ 8,500.00
 25.0 Ac @ $340.00 AC Rem. Value
 (65% Damage, 35% Rem. Value)
 Land 100' to 200' of R/W both sides
 25.0 Ac @ $630.00/AC Rem. Value 15,750.00
 (35% Damage, 65% Rem. Value)
Rear land severed by line
 205 AC @ $725.00 Re. Value 148,625.00
 (25% Damage, 75% Rem. Value)
Front land damaged by access
 375.75 Ac @ $920.00/AC Rem. Value 345,690.00
Batture land 55.2 AC @ $967 AC 53,380.00
 ___________
 (No Damage)
Total value of Land Remaining $571,945.00
 $571,945.00
 ===========
Estimate of damages to remaining land ............................ $ 91,250.00
Plus value of part taken (24.10 AC @ $967.00 AC) ................. 23,305.00
 -----------
Estimate of total loss ........................................... $114,555.00
 (Land taken plus damages)"
 Mr. Williams' estimated before and after value of the Jumonville
property is as follows:
 "JOHN JUMONVILLE PROPERTY
 BEFORE AND AFTER VALUE ESTIMATE
Total value of land before the taking
 3337 Ac @ $1150.00 per Ac ................................... $387,550.00
Less cost to bring in rail transportation ...................... 65,000.00
 ___________
 (1/3 cost of 3.5 miles @ $50,000/mile plus $20,000
 cost of highway crossing)
Present value of land .......................................... $322,550.00
 (Indicated value per Ac- $960.00)
Less value of part taken
 7.84 AC @ $960.00 per AC ................................... 7,334.00
 ___________
Value of remaining land as part of the whole tract ............. $315,216.00
Value of remaining land after the taking
 Area within 100' of R/W
 9.0 AC @ $335.00/AC Rem. Value $ 3,015.00
 (65% Damage, 35% Rem. Value)
 Area from 100' to 200' of R/W
 9.0 AC @ $625.00/AC Rem. Value 5,625.00
 (35% Damage, 65% Rem. Value)
 Severed area to rear of R/W
 14.18 AC @ $670.00 AC Rem. Value 9,500.00
 (30% Damage, 70% Rem. Value)

*22
 Rem. land front of R/W- Escl. of Battures
 264.2 AC @ $910.00AC-Rem. Value $240,422.00
 5% Damage, 95% Rem. Value)
 Rem. Batture land 33.1 AC @ $960.00/AC 31,776.00
 ___________
 (No Damage)
 Total value of remaining land $290,338.00
 $290,338.00
 ===========
Estimate of damages to remaining land ........................... $ 24,878.00
Plus value of part taken (7.64 AC @ $960.00/AC) ................. 7,334.00
 ___________
Estimate of total loss .......................................... $ 32,212.00
 ===========
 (Land taken plus damage to rem.)"

It was stipulated that Mr. W. D. McCants', the other appraiser of defendants, testimony would be substantially the same as Mr. Williams with the following exceptions: He would value the land as having a present value without rail service of $950.00 per acre; he would testify that the land was damaged to a depth of 300 feet on each side of the right of way instead of 200 feet; he set severance damage to this 300 foot belt at 30% and he would testify that the land beyond the 300 depth to the rear of the servitude is damaged to the extent of 50% of its value and this would apply to both tracts. His testimony as to the land in front of the servitude was that it was not damaged.
The sales considered most comparable by Mr. McCants were Jennings to Dow sale, Laws to Copolymer sale, and especially the sale of Orange Grove Plantation to Enjay Company. This was a sale of a thousand acre tract in Ascension Parish on June 10, 1966 for $1,785.00 per acre.
Mr. Derbes in his testimony down graded the value of the subject properties because there were no industries using lands close by for industrial purposes, it had no access by highways other than the river road and the river itself was on the making bank and was not deep enough to permit transportation by boat. He gave these as one of the reasons why he considered the east bank of the river more desirable for industry than the west bank.
There is testimony in the record that the original big industries which located up and down the river had no better highway at the time than the river road.
While Mr. Driggers will testify in line with Mr. Derbes that the highest and best use of the subject properties was for agricultural purposes, he felt the land did definitely have a future use as industrial property.
The market value of the property involved in an expropriation suit must be determined by valuing it at its highest and best and most profitable use considering the location, topography and adaptability to that use within the near or foreseeable future. See City of Shreveport v. Abe Meyer Corp., 1951, 219 La. 128, 52 So.2d 445; State, Through Department of Highways v. Madden, La.App., 2nd Cir. 1962, 139 So.2d 21; Central Louisiana Electric Co. v. Mire, La.App., 1st Cir. 1962, 140 So.2d 467; State, Through Department of Highways v. Carlina, La.App., 1st Cir. 1964, 169 So.2d 265.
This Court in State, Through Department of Highways v. Carlina, supra, held as follows:
"The Courts have held that the value of land expropriated must be the best and highest use to which the property *23 may reasonably be put in the not too distant future. If such potential use is shown within the reasonably near future, the owner is entitled to compensation on the basis of such use notwithstanding the property is not being utilized for such at the time of the taking. Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6, and Central Louisiana Elec. Co., v. Harang, La.App., 131 So.2d 398."
There has been a definite pattern in recent years of sales of tracts of land from six hundred to fifteen hundred acres on the Mississippi River between Baton Rouge and Bonne Carre Spillway. This is particularly true after the sale to the Wyandotte Company and subsequent to that time this pattern has been followed by quite a number of other industries. It begins to look like the entire Mississippi River front from Baton Rouge, or even further north, down to New Orleans and below will be adapted to industrial use in the foreseeable future. This pattern holds true for property which is not located in the immediate vicinity of property already being used for industrial purposes. See State Through Department of Highways v. Burden, La.App., 1st Cir. 1965, 180 So.2d 784. We believe the subject properties fall within this pattern.
We, therefore, concur in the finding of the Trial Judge that the highest and best use for this property was for industrial purposes.
With regard to the value we see very little need to go into a lengthy discussion of this. The Trial Judge had the benefit of the two appraisers testifying and two others who would have testified substantially to the same thing. In fact, they had testified in other cases involving similar property. He saw fit to base his decision on the testimony of Mr. Kermit Williams, and based his quantum on Mr. Williams' estimate of $1150.00 fee value per acre.
There is only $300.00 difference between this finding and the testimony of Mr. Derbes fixing the value at $850.00 per acre. Plaintiff's attorney in his Brief concedes that this fee value is substantially correct.
The Power Company complains bitterly over the failure of the Judge to use 50% rule in tendering the value of the servitude. There have been cases which have held that 50% is a proper value to use in determining the value of servitudes. However, there are other cases and especially in recent years. The case of Louisiana Power and Light Company v. Simmons, 1956, 229 La. 165, 85 So.2d 251 fixed the value of a servitude for 500,000 volts of electric transmission lines across an agricultural tract at 80% of the fee value of the land within the servitude.
This Court in Gulf States Utilities Company v. Heck, La.App., 1st Cir., 1966, 191 So.2d 761 awarded 100% of the fee value for a servitude over a tract having residential property. This Court awarded Utilities Co. v. Moore, La.App., 1st Cir., 197 So.2d 106. This Moore case was a right of way for an extra transmission line to carry 110,000 volts across potentially residential property. This Court awarded 100% of the fee value of the property within the servitude.
Mr. Driggers, one of plaintiff's appraisers, used an 80% formula instead of 50% formula adopted by Mr. Derbes. There is testimony in the record by Mr. Derbes that they could build roads, canals, railroads under the transmission line and on the right of way. It was admitted by Mr. Williams that railroads and roads could cross under the right of way and that the transmission line would not interfere. There were pictures offered in the record showing high powered lines going across boulevards and through residential sections. However, some of these lines were only for 115 or 230 K.V.'s.
*24 There is no question but what a 500,000 K.V. line to which will be added later two 230 K.V. lines would create a psychological scare in the minds of people using the land under it. This has been recognized in the case of Gulf States Utilities Co. v. Wright, La.App., 195 So.2d 663, No. 6810 on the Docket of this Court which has not yet been reported, and the case of Central Louisiana Electric Co. v. Harang, La.App., 131 So.2d 398, at page 402.
We also feel that the Trial Judge was correct in awarding severance damages to the two 200 foot strips on each side of the right of way. There is no doubt that these strips being in close proximity to the right of way and with a potential transmission line of 960,000 volts (960 K.V.) we believe that it would have a psychological effect on any purchaser or user of property this close to the transmission line. He graded his percentage evaluation according to the distance to the transmission line or right of way the strip furthest from it having the smallest percentage of severance damages.
We also concur with the Trial Judge's finding that the land to the rear of the right of way line, or the transmission line, would suffer some severance damage because it would be separated from the front portion of the property. The Trial Judge was correct in awarding no damages for that portion of defendants' properties lying between the 200 foot strips and the river, on the upper side of the right of way and the river itself as we cannot see where this property would suffer any severance damage.
We held in Gulf States Utilities Co. v. Moore, supra, that an extremely high voltage power line with an unusually wide servitude can cause greater severance damage to the areas immediately adjacent to the right of way than to the remainder of the tract. See also Texas Pipe Line Co. v. National Gasoline Co. of La., Inc., 1943, 203 La. 787, 14 So.2d 636; Gulf States Utilities Company v. Comeaux, La.App., 3rd Cir. 1966, 182 So.2d 183; Gulf States Utilities v. Cormier, La.App., 3rd Cir. 1966, 182 So.2d 176; Central Louisiana Electric Co. v. Mire, La.App., 1st Cir., 140 So.2d 467.
The Power Company complained that the Court erred in granting the defendants' motion for a new trial and amending the judgment to reserve to defendants a right to recover additional compensation for damages to trees that may be cut or damaged in the servitude area. Had he awarded full fee value of the land we believe that the appellant's argument would be correct. However, as testimony shows there is some little timber in the right of way which unquestionably the defendants would be entitled to recover damages if they are cut, destroyed or damaged in any way.
In this case the Trial Court did not award the full fee value to land within the right of way. LSA-R.S. Sec. 2.1 contains the following section:
"B. All claims for property by, or for damages to the owner caused by the expropriation of property pursuant to R.S. 19:2 shall be barred by the prescription of two years commencing on the day on which the property was actually occupied and used for the purpose of the expropriation."
This is a recognition by the Legislature that a land owner might have an additional claim for damages over and above any amount awarded in an expropriation proceeding.
This was recognized by this Court in the case of Stoufflet v. United Gas Pipe Line Co., La.App., 1st Cir. 1964, 162 So.2d 828 in which the Court allowed recovery for physical damage to crops and timber in a suit filed by the land owner against the expropriating *25 authorities some nine months after the Pipe Line had completed its work.
We, therefore, feel that the Judge is correct in this holding.
The defendants in their answer to the appeal held that the Judge was in error in allowing the right of ingress and egress to the right of way over the remainder of the defendants' property. We believe that it is inherent in servitudes of this type that the party obtaining the servitude should have the right of ingress and egress in order to protect, repair, upkeep and maintain the right of way for the purposes for which the servitude is granted. Without such a right he will be seriously hampered and in fact crippled in maintaining its service. We believe that it is axiomatic that in the event he caused damages to the property by exercising this right of ingress and egress that he would be held responsible for such damage.
The appellees in their answer to the appeal seek to have the fees of their expert witnesses Kermit A. Williams and W. D. McCants increased to $500.00 each plus $100.00 each for attendance at Court. The Trial Judge in his reasons awarded a total fee to each of these witnesses of $750.00 for their preparatory work and $100.00 for attendance at Court. He then in his respective judgments split this in half and the judgment in each case gives each appraiser $375.00 for preparatory work and $50.00 for attendance at Court. Since these two cases were consolidated for trial, and affect joining properties to each other, we feel that the fee as fixed by the Court is sufficient.
For these reasons we find that the Trial Judge did not abuse his discretion or commit manifest error and accordingly the judgment of the Lower Court is affirmed.
Affirmed.